NEW JERSEY DIVISION OF YOUTH AND FAMILY SER-
VICES, PLAINTIFF, v. BRUCE WUNNENBURG AND VIR-
GINIA WUNNENBURG, DEFENDANTS.

IN THE MATTER OF THE GUARDIANSHIP OF BRENDA
LEE WUNNENBURG, CYNTHIA LYNN WUNNENBURG,
AND JUNELLE WUNNENBURG, MINORS.

Juvenile and Domestic Relations Court
Cumberland County

January 3, 1977.

*Mr. William B. Mild,* Deputy Attorney General, for plaintiff (*Mr. William F. Hyland,* Attorney General, attorney).

*Mr. Robert S. Greenberg* for defendant Virginia Wunnenburg.

*Mr. Samuel Umbberman* for defendant Bruce Wunnenburg (*Mr. Lawrence Magid,* attorney).

*Mr. Murray Taslanik,* law guardian on behalf of Brenda Lee, Cynthia Lynn and Junelle Wunnenburg (Office of the Public Defender, attorneys).

KLEINER, J. C. C. This matter is before this court on an amended complaint for guardianship filed by the Division of Youth and Family Services (Division) pursuant to *N. J. S. A.* 30:4C–15 seeking to terminate parental rights under the authority of *N. J. S. A.* 30:4C–20.

The basis for such action in the present case may be found in *N. J. S. A.* 30:4C–15(c).

Whenever * * * (c) it appears that the best interests of any child under the care or custody of the Division of Youth and Family Services require that he be placed under guardianship * * *

and in *N. J. S. A.* 30:4C–20,

* * * Such court shall make an order terminating parental rights and committing such child to the guardianship and control of the [Division] . . . and such [Division] shall be the legal guardian of such child for all purposes, including the placement of such child for adoption.

The children affected by these proceedings are Brenda Wunnenburg, born January 28, 1974; Cynthia Wunnenburg, born August 7, 1975; and Junelle Wunnenburg, born June 11, 1976.

The natural parents, Bruce and Virginia Wunnenburg, are 25 and 28, respectively, and were married on April 8, 1973.

Insofar as the basis for these proceedings emanates from the prior "care or custody" of a child with the Division, (*N. J. S. A.* 30:4C–12) a review of the legal history of this family must be examined.

As in *Doe v. Downey, N. J. Super.* (App. Div. 1976), this matter was initially instituted by the Division on a com-

plaint seeking an order of removal of Brenda filed pursuant to *N. J. S. A.* 9:6–8.31 alleging child abuse or neglect, which complaint additionally sought to make Brenda a ward of the court, placing her under the *care* and supervision of the Division pursuant to *N. J. S. A.* 30:4C–12.

Care is statutorily defined by *N. J. S. A.* 30:4C–2(c) as "cognizance of a child for the purpose of providing necessary welfare services, or maintenance, or both."

Care is distinguished from "custody," which is statutorily defined by *N. J. S. A.* 30:4C–2(d) as "continuing responsibility for the person of a child, as established by a surrender and release of custody or consent to adoption, for the purpose of providing necessary welfare services, or maintenance, or both."

As is required in child abuse-neglect matters, by virtue of *N. J. S. A.* 9:6–8.43(a), and due to the indigency of the natural parents, counsel was assigned and a law guardian, *N. J. S. A.* 9:6–8.21(d); *N. J. S. A.* 9:6–8.23, appointed to appear on behalf of Brenda. See also, *Crist v. N. J. Div. of Youth and Family Services,* 135 *N. J. Super.* 573 (App. Div. 1975).

On August 8, 1975 an order removing Brenda from her parents was entered and she was placed by the Division in a foster home where she has continued to reside.

The second child, Cynthia, has resided in a foster home since she was five weeks old, pursuant to a foster care agreement voluntarily executed by her natural parents on September 29, 1975, pursuant to *N. J. S. A.* 30:4C–11.

Testimony at this trial revealed that the voluntary placement of Cynthia occurred after her parents were advised that the Division intended to file a child abuse-neglect complaint and an application for the involuntary removal of Cynthia from the home of her parents.

Prior to the birth of Junelle Wunnenburg, the Division filed a separate complaint seeking to terminate parental rights as to Brenda and Cynthia.

The third child, Junelle, was removed from the custody of her parents on June 24, 1976, on a third complaint filed pursuant to *N. J. S. A.* 30:4C–12. Thereafter, the second complaint was amended, seeking to terminate parental rights as to Junelle as well as Brenda and Cynthia.

The three matters were consolidated for trial.

This factual background clearly raises a question of first impression: May a child be involuntarily removed from the custody of its parents under *N. J. S. A.* 30:4C–12 and thereafter can the parental rights of said parents be terminated under *N. J. S. A.* 30:4C–15 and *N. J. S. A.* 30:4C–20?

To answer this question a complete analysis of proceedings under *N. J. S. A.* 30:4C–1 *et seq.* is necessary. Such an analysis was recently prepared by Judge Abraham L. Rosenberg for the New Jersey Judicial Seminar on 'Child Abuse and Neglect, and he states:

Title 30:4C [30:4C] provides three types of child care and protective procedures. Under 30:4C–11, a voluntary application for care or custody may be made by a parent or relative or a person or agency having a special interest in the child or by the child itself or even on behalf of an 'unborn child. Proceedings under 30:4C–12 and 30:4C–15 are involuntary. Title 30:4C–12 permits a complaint for parental misconduct to be made to D. Y. F. S. by an interested person or agency. The Division is thereupon required to investigate. If intervention is determined to be essential, the parent is given an opportunity to make a voluntary application for *Care* under 30:4C–11. If the parent refuses, the Court at a summary hearing, may place the child under the *Care* of D. Y. F. S. for a period of six months, such placement being subject to extension. At this juncture it is necessary to distinguish the concepts of "Care", "Custody" and "Guardianship" as defined in 30:4C–2. "Care" includes welfare services or maintenance or both; "Custody" involves control over the person and "Guardianship" includes control over the property as well as the person. As stated, D. Y. F. S. may accept the child for custody as well as care pursuant to a voluntary application made under 30:4C–11. It is curious, however, that when an involuntary proceeding is effected under 30:4C–12 the Court may award *Care* and supervision only. Provision for even temporary custodial placement has apparently been omitted. Perhaps this was an oversight. Neither does 30:4C–12 provide specific authority for emergency or court ordered takings prior to the filing of a complaint.

It must be noted, however, that had the Division obtained an order for the "care" of Junelle Wunnenburg on June 24, 1976, upon the filing of its amended complaint pursuant to *N. J. S. A.* 30:4C–15 and *N. J. S. A.* 30:4C–20, it could have additionally applied for an interlocutory order under *N. J. S. A.* 30:4C–17 committing Junelle to the Division pending final hearing. Thus, the mere filing of an additional document would have resulted in the removal of Junelle from the custody of her parents.

Insofar as the complaint seeking "care" under *N. J. S. A.* 30:4C–12 also indicated an intention to file an amended complaint under *N. J. S. A.* 30:4C–15 and *N. J. S. A.* 30:4C–20, this court now holds that the involuntary removal of Junelle predicated under the verified complaint which was filed does not render these proceedings fatally defective.

Additionally, if the involuntary removal of Junelle had not been permitted, but if her "care" had been awarded to the Division, the basis for jurisdiction under *N. J. S. A.* 30:4C–15(c) would have been established insofar as "care" *alone* is a sufficient basis for the institution of proceedings to terminate parental rights. The statute speaks in the disjunctive: "care or custody"; both elements are not a prerequisite to these proceedings.

It must also be noted that the natural parents did not legally resist the removal of Junelle either prior to or during this trial.

Having disposed of this procedural question, this court must determine, based upon the standards established by *In re Cope,* 106 *N. J. Super.* 336, 340 (App. Div. 1960), if the Division has established "affirmatively that the child's 'best interests' will be substantially prejudiced if he is permitted to remain with his parent — *e. g.,* that his health and development have been or probably will be impaired and that the parent is unlikely or unwilling to change, or that the parent is in some way incapable of caring for the child or unwilling to do so."

■ The burden of proof imposed upon the Division is to establish that termination of parental relationships is necessary by clear and convincing evidence. *In re N.,* 96 *N. J. Super.* 415 (App. Div. 1967).

■ A review of the salient portions of the testimony at trial clearly serves as the basis for the ultimate decision of this court.

### *As to Brenda Wunnenburg.*

On April 25, 1975 Brenda, at 15 months of age and then an only child, was left in her crib, alone, locked within her parents' home where she was discovered by a Division case worker who investigated as a result of an anonymous telephone call from a neighbor.

On June 4, 1975 Brenda was found with lacerations on her face and body. Her mother admitted clawing the infant in anger. At trial she recanted this earlier admission but offered no logical explanation for the injury.

As a result of these incidents, Division home service was offered to the Wunnenburgs. Although they agreed to accept such service and to seek counselling, Brenda's parents continually frustrated the efforts of the Division to afford them assistance: *e. g.* failing to remain at home when appointments were scheduled; refusing to admit Division workers to the home; refusing to participate in counselling. Virginia Wunnenburg admitted at trial that she frustrated the Division's efforts on "orders from her husband."

In those instances in which Division workers were permitted within the residence, they continually found Brenda confined to play in a play pen within a darkened room without toys or other forms of stimulation.

Inspections of maternal care revealed Brenda's mother performed her maternal functions silently and awkwardly. Routine parental chores such as diapering, bathing, feeding, and dressing the child were difficult for Virginia Wunnenburg to perform or to imitate after repeated instruction. She

did not orally or physically communicate love or affection for the child.

Home inspections and interviews revealed that Brenda's father refused to participate in any routine functions of child care nor did he assist his wife in providing adequate food or necessary medical attention for their daughter. The father's total lack of concern for Brenda's well-being or best interest is evidenced by his action on August 8, 1975, while his wife was hospitalized giving birth to their second child. Bruce Wunnenburg left Brenda at the home of a babysitter whose surname he did not know. An inspection of that residence by the Division found Brenda sleeping on a soiled, uncovered mattress with an infant feeding bottle half-filled with soured milk. Brenda was pestered by flies, and roaches were observed within the residence and near the child's crib. These facts led to the abuse-neglect emergency removal of Brenda and her placement in a foster home.

At the trial of these proceedings Bruce Wunnenburg continued to insist that his choice of a babysitter was proper and the conditions within said residence were adequate.

Medical examinations performed immediately after Brenda's removal revealed that although she was then 19 months of age, her body weight and height were equivalent of a five-month-old infant. She could not hold her head erect and did not respond to oral stimuli. A medical diagnosis of psychomotor retardation was rendered.

Due to the fact that Brenda quickly improved in foster care placement, a subsequent medical diagnosis concluded that Brenda's initial psychomotor retardation and malnourished condition were not intrinsic or a result of organic defect but were causally related to social factors and lack of care and proper parental care within her home environment.

At trial, Brenda's parents offered no medical testimony to contradict the diagnosis rendered.

Insofar as this trial constitutes a factfinding hearing (*N. J. S. A.* 9 :6–8.44), on the original complaint filed pur-

suant to *N. J. S. A.* 9:6–8.8 et seq., this court finds as a fact that Brenda was a neglected child and was both physically and emotionally abused, both by overt action and by the omissions to act by both parents. *N. J. S. A.* 9:6–8.9(d).

Although this determination need only be based upon the preponderance of the evidence, *N. J. S. A.* 9:6–8.46(b), this court finds that the evidence of abuse-neglect in this matter has been established by clear and convincing evidence which was not contradicted by any evidence offered by Brenda's parents.

The introduction to *Childhood Deprivation,* compiled by Albert R. Roberts, (1974), states:

> Childhood deprivation is defined as an act or series of acts which result in a child * * * being physically, morally, emotionally, medically, socially, and/or educationally neglected or abused. The physical and mental health of deprived children is endangered by the willful or uncontrollable acts or omissions to act, of emotionally immature, irresponsible, selfish or uninformed parents, guardians or caretakers.

*Title 9* proceedings were enacted by our Legislature to prevent childhood deprivation as defined above. See also, *Doe v. Downey, supra.*

Subsequent to the factfinding hearing, *N. J. S. A.* 9:6–8.44 the court is required to conduct a dispositional hearing, *N. J. S. A.* 9:6–8.45, which may be conduced separately or immediately following the factfinding hearing, *N. J. S. A.* 9:6–8.48(b), after "the required findings are made."

Insofar as the Division seeks to terminate parental rights, which is *not* appropriate relief under *N. J. S. A.* 9:6–8.51, a dispositional hearing pursuant to *N. J. S. A.* 9:6–8.45 need not be required unless the requested relief under *N. J. S. A.* 30:4C–20 is denied.

### As to Cynthia Wunnenburg

After the emergency removal of Brenda, the Division began to monitor the care rendered to newly-born Cynthia.

On September 3, 1975 a home inspection revealed that Cynthia was suffering from a grossly severe fungal infection and was malnourished. Her weight was below her original birth weight and she had not received any medical attention for the infection.

The Division arranged for an immediate medical examination, and a refillable prescription was given to Cynthia's parents and a Medicaid card provided to assist them in obtaining the necessary medication. Cynthia's mother did not obtain the medication. Cynthia's father, although specifically advised to obtain the medication at 6:00 P.M. that evening, also failed to do so, choosing instead to retire for the evening.

The following day another home inspection found Cynthia asleep in an unchanged urine-soaked diaper in a urine-stenched room.

Uncontradicted testimony further revealed that although the needed medication was provided through the assistance of the family minister, when the need to refill the prescription arose. Cynthia's parents did not refill it and allowed Cynthia to remain untreated for three days. The prescription was renewed by Division workers.

Due to a continued weight loss Cynthia was hospitalized. No organic etiology was discovered for the condition; a medical diagnosis of caloric deprivation was rendered, inasmuch as with regular hospital feedings Cynthia showed immediate signs of thriving and weight gain.

By virtue of the above facts the Division advised the Wunnenburgs of its intention to seek an order of protective custody of Cynthia. The Wunnenburgs voluntarily surrendered Cynthia. *N. J. S. A.* 30:4C–11.

### As to Junelle Wunnenburg

Subsequent to the surrender of Cynthia the Division and other public service agencies offered assistance and advice to the Wunnenburgs in an effort to train and teach proper parental care in anticipation of eventually reuniting this fam-

ily. During this period Virginia Wunnenburg became pregnant and gave birth to Junelle. Due to prematurity and a jaundice condition, Junelle remained hospitalized after the mother was released.

On the day of Junelle's hospital release, Bruce Wunnenburg, who owned an automobile, refused to drive his wife to the hospital. A friend provided the necessary transportation, and on leaving the hospital Virginia Wunnenburg and Junelle went directly to the home of this friend for a visit.

Uncontradicted and credible testimony was offered to establish that during this visit Virginia Wunnenburg was extremely awkward in handling Junelle and showed signs of frustration when attempting to "burp" the child, for she was observed hitting Junelle's back harder and harder.

A Division inspection that day of the Wunnenburg residence revealed that it was littered with junk to the degree that several witnesses described the interior as a "maze of alleys," "cluttered" and "dirty." As a result of this inspection and due to the Division's prior knowledge of the treatment of Brenda and Cynthia, the Division filed a complaint pursuant to *N. J. S. A.* 30:4C–12 and indicated an intention to file an amended complaint respecting Junelle pursuant to *N. J. S. A.* 30:4C–15 and *N. J. S. A.* 30:4C–20, which it did in fact file.

## CONCLUSION

■ The judicial standards requisite to terminate parental rights have been defined by *In re Cope,* 106 *N. J. Super.* 336 (App. Div. 1960), wherein it was held that the State must "demonstrate affirmatively that the child's 'best interest' will be substantially prejudiced * * * *e. g.,* that his health and development have been or *probably* will be impaired and that the parent is unlikely or *unwilling* to change, or that the parent is in some way incapable of caring for the child or unwilling to do so."

From the facts above and other clear, convincing, and credible testimony offered at trial, as well as the court's observations of Virginia Wunnenburg, I find that the State has clearly established that Virginia Wunnenburg is incapable of caring for children.

The testimony is further clear and convincing that Bruce Wunnenburg is unlikely and unwilling to change his negative and uncompromising attitude against accepting supportive community services. Without such services it is clear that Virginia Wunnenburg could not properly care for one child, let alone three.

It is equally clear that the Wunnenburgs have failed to demonstrate any sincere interest in or affection for their children. In 19 months of foster care, Brenda was visited once by her mother and not at all by her father.

In six months of foster care, Junelle has never been visited by either parent.

Since January 1976, other than two visits during the course of this trial, Cynthia was visited twice by her mother and once by her father. No logical or rational excuse was offered by either parent for this lack of interest or concern for these children.

This court finds as a fact that Brenda's and Cynthia's health was endangered while residing with their parents, and that Brenda's entire development, both physical and emotional, was in fact impaired, which finding is predicated upon uncontradicted medical testimony offered at trial.

It is this court's opinion that the "best interests" of Brenda and Cynthia "will be substantially prejudiced" if they were returned to their parents. *In re Cope, supra; N. J. S. A.* 30:4C–15(c) and accordingly an order terminating parental rights shall be entered. *N. J. S. A.* 30:4C–20.

Respecting Junelle Wunnenburg, this court must stress that the standard of *In re Cope, supra,* by use of the word *"probably"* (at 341), connotes speculation predicated upon known facts established by clear and convincing evidence.

This court finds that the evidence presented in this matter clearly and convincingly establishes that it would be contrary to the best interest of Junelle if she were returned to her parents and that in fact this child's best interests would be substantially prejudiced to permit such reunion. Parental rights will therefore be terminated. *N. J. S. A.* 30:4C–20.